# United States Court of Appeals

### for the

# Fifth Circuit

---

Case No. 24-20347

LEXON INSURANCE COMPANY, INCORPORATED,

*Plaintiff-Appellant,*

v.

CHEVRON U.S.A. INCORPORATED; SOJITZ ENERGY VENTURE, INCORPORATED; BP AMERICA PRODUCTION COMPANY,

*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON, IN CASE NO. 4:21-CV-990 HONORABLE ALFRED H. BENNETT, U.S. DISTRICT JUDGE

## PETITION FOR REHEARING *EN BANC*

Adam J. Russ
GORDON, ARATA, MONTGOMERY,
  BARNETT, MCCOLLAM,
  DUPLANTIS & EAGAN LLC
1001 Fannin Street
Suite 3850
Houston, Texas 77002
(713) 333-5500
aruss@gamb.com

Armistead M. Long
GORDON, ARATA, MONTGOMERY,
  BARNETT, MCCOLLAM,
  DUPLANTIS & EAGAN LLC
1015 St. John Street
Lafayette, Louisiana 70501
(337) 237-0132
along@gamb.com

Kyle D. Gooch
HARRIS BEACH
  MURTHA CULLINA PLLC
99 Garnsey Road
Pittsford, New York 14534
(585) 419-8800
kgooch@harrisbeachmurtha.com

Brian D. Ginsberg
  *Counsel of Record*
HARRIS BEACH
  MURTHA CULLINA PLLC
445 Hamilton Avenue
Suite 1206
White Plains, New York 10601
(914) 683-1200
bginsberg@harrisbeachmurtha.com

*Counsel for Plaintiff-Appellant Lexon Insurance Company, Inc.*

# CERTIFICATE OF INTERESTED PERSONS

I, Brian D. Ginsberg, a member of the Bar of this Court and counsel of record for plaintiff-appellant Lexon Insurance Company, Inc., certify that the following listed persons and entities have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiff-appellant:**

> Lexon Insurance Company, Inc.

**Defendants-appellees:**

> Chevron U.S.A., Inc.
> Sojitz Energy Venture, Inc.
> BP America Production Co. (successor-in-interest of Amoco Production Co.)

**Defendants:**

> Roger D. Linder
> General Miles Biggs, Jr.

**Counsel for plaintiff-appellant, including counsel who appeared only in the district court:**

> Harris Beach Murtha Cullina PLLC
> Brian D. Ginsberg
> Kyle D. Gooch
> Dale A. Worrall
> Lee E. Woodard
> Katerina M. Kramarchyk (formerly of Harris Beach PLLC)

GORDON, ARATA, MONTGOMERY, BARNETT,
MCCOLLAM, DUPLANTIS & EAGAN LLC
Adam J. Russ
Armistead M. Long
Jared G. LeBlanc (formerly of Gordon, Arata, Montgomery,
Barnett, McCollam, Duplantis & Eagan LLC)

**Counsel for defendants-appellees, including counsel who appeared only in the district court:**

LISKOW & LEWIS
Michael D. Rubenstein
Jana L. Grauberger
Kelly B. Becker
Kathryn Z. Gonski
Stephen W. Wiegand
Elizabeth M. Byrne (formerly of Liskow & Lewis)

ADAMS & REESE LLP
Robin B. Cheatham
Leigh Ann Schell
Scott R. Cheatham
George R. Parrott

GREENBERG TRAURIG LLP
Craig A. Duewall
Nicole S. Bakare (formerly of Greenberg Traurig LLP)

**Counsel for defendants:**

THE DERBES LAW FIRM LLC
Albert J. Derbes
Eric J. Derbes
Mark S. Goldstein
Bryan J. O'Neill

September 16, 2025

Respectfully submitted,

*/s/ Brian D. Ginsberg*

Brian D. Ginsberg
 *Counsel of Record*
HARRIS BEACH PLLC
445 Hamilton Avenue
Suite 1206
White Plains, New York 10601
(914) 683-1200
bginsberg@harrisbeach.com

*Counsel for Plaintiff-Appellant
 Lexon Insurance Company, Inc.*

# RULE 40(b)(2) STATEMENT

This case involves a question of exceptional importance in which the panel's decision is contrary to decisions of the Supreme Court of the United States.

The question presented is whether established federal common law is part of the "laws . . . of the United States" that are extended to the Outer Continental Shelf pursuant to Section 4 of the Outer Continental Shelf Lands Act, codified as amended at 43 U.S.C. § 1333.

The panel's decision, which held that established federal common law of equitable subrogation did not apply on the Outer Continental Shelf, conflicts with the following Supreme Court decisions: *Parker Drilling Management Services, Ltd. v. Newton*, 587 U.S. 601 (2019), *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473 (1981), and *Pearlman v. Reliance Insurance Co.*, 371 U.S. 132 (1962).

# TABLE OF CONTENTS

Page

Certificate of Interested Persons ................................................................. i

Rule 40(b)(2) statement.............................................................................. iv

Table of Contents....................................................................................... v

Table of Authorities .................................................................................. vi

Issue Presented.......................................................................................... 1

Statement of the Case ............................................................................... 3

      A.     Course of Proceedings and Disposition of the Case............... 3

      B.     Facts Necessary to the Argument of the Issues .................... 5

Reasons for Granting the Petition ............................................................. 6

I.     Pre-OCSLA established federal common law is part of the
"laws . . . of the United States" applicable on the Outer
Continental Shelf. ............................................................................. 6

II.    The Panel's decision applying inconsistent state law in place
of established federal common-law principles of equitable
subrogation will cause disruption to the surety market. .............. 14

Conclusion................................................................................................ 16

Certificate of Service ............................................................................... 17

Certificate of Compliance ....................................................................... 18

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Am. Sur. Co. of New York v. Lewis State Bank,*
  58 F.2d 559 (5th Cir. 1932) ................................................................ 14

*Chevron Oil Co. v. Huson,*
  404 U.S. 97 (1971) ............................................................................ 12

*Gulf Offshore Co. v. Mobil Oil Corp.,*
  453 U.S. 473 (1981) ............................................................ iv, 11, 12, 13

*IBP, Inc. v. Alvarez,*
  546 U.S. 21 (2005) .............................................................................. 9

*Illinois v. Milwaukee,*
  406 U.S. 91 (1972) .......................................................................... 7, 9

*Lexon Ins. Co. v. Chevron U.S.A. Inc.,*
  2025 WL 2397624 (5th Cir. Aug. 19, 2025) ......................................... 5

*National Farmers Union Ins. Cos. v. Crow Tribe,*
  471 U.S. 845 (1985) .......................................................................... 10

*Parker Drilling Management Services, Ltd. v. Newton,*
  587 U.S. 601 (2019) ............................................................ iv, 10, 12, 13

*Pearlman v. Reliance Ins. Co.,*
  371 U.S. 132 (1962) ............................................................ iv, 2, 3, 14

*Snow v. First American Title Ins. Co.,*
  332 F.3d 356 (5th Cir. 2003) ............................................................... 9

Page(s)

**Statutes**

28 U.S.C. § 1331 ................................................................. 7, 9, 10

43 U.S.C.

   § 1331(a)(1)(A) ..................................................... 1, 7, 8, 11, 12

   § 1333(a)(2) ............................................................................ 8

   § 1333(a)(2)(A) ................................................................. 7, 10

   § 1333(b)(2) ............................................................................ 8

Louisiana Civil Code ................................................................ 2

**Regulations**

30 C.F.R.

   § 250.1701 ............................................................................. 6

   § 556.604 ............................................................................... 6

   § 556.710 ............................................................................... 6

**Other Authorities**

Restatement (Third) of the Law of Suretyship & Guaranty

   § 27 ..................................................................................... 14

   § 28 ..................................................................................... 14

## ISSUE PRESENTED

This case presents a question of exceptional importance, worthy of en banc review by this Court: whether established federal common law is part of the "laws . . . of the United States" that are extended to the Outer Continental Shelf under Section 4 of the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1333(a)(1)(A).

OCSLA extends the "laws . . . of the United States" to the Outer Continental Shelf. Where federal law speaks to an issue, that federal law controls. But where federal law leaves a gap, OCSLA directs that it be filled by using state law as surrogate federal law. It is undisputed that OCSLA does not permit federal courts to create new federal common law to fill in gaps in federal law. The question presented by this case concerns what it means for there to be a gap where existing federal common law addresses an issue.

This case involves a paying surety's equitable subrogation right—its right to seek reimbursement by stepping into the shoes of the obligee. More than 60 years ago, the Supreme Court of the United States noted that "there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid

to enforce his right to be reimbursed." *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136–37 (1962). The existence and scope of a surety's equitable subrogation rights under federal common law is well established through innumerable judicial decisions, including those of the Supreme Court.

The panel's decision in this case holds that even well-established, pre-OCSLA federal common law is not part of the "laws . . . of the United States" extended to the Outer Continental Shelf. As a result, the panel held that common-law principles of equitable subrogation articulated in *Pearlman* were inapplicable here. Having thus concluded that there was a "gap" in federal law to be filled, the panel looked to the Louisiana Civil Code to determine the scope of a paying surety's subrogation rights. Applying Louisiana law, the panel construed those rights to be narrower than under federal common law—a difference that was dispositive to the petitioner's claims here.

This Court should order rehearing en banc to consider whether Congress intended, by adopting OCSLA, to discard even well-established federal common law rights in favor of inconsistent state law. As discussed below, this case is worthy of en banc review for two reasons. First, the panel's decision conflicts with multiple decisions of the United States

Supreme Court, both as to the interpretation of OCSLA and as to the extent of a paying surety's equitable subrogation rights. Second, the panel's decision upsets decades of reliance by sureties as to the scope of their equitable subrogation rights under federal common law as articulated in *Pearlman*, which will lead to uncertainty in future suretyship transactions involving the Outer Continental Shelf.

## STATEMENT OF THE CASE

### A.    Course of Proceedings and Disposition of the Case

In March 2021, Plaintiff-Appellant Lexon Insurance Company, Inc. ("Lexon") commenced this action in the United States District Court for the Southern District of Texas. As relevant here, Lexon asserted a claim for equitable subrogation against Defendants-Appellees Chevron U.S.A. Inc., Sojitz Energy Venture, Inc., and BP America Production Company. Lexon sought to exercise its right of equitable subrogation to step into the shoes of the government to recover approximately $11.16 million that Lexon had surrendered to the United States Bureau of Ocean Energy Management ("BOEM") as surety for nonparty Linder Oil Co. ("Linder") in connection with certain performance bonds to secure decommissioning obligations on an oil-and-gas rights lease on the Outer Continental Shelf.

After discovery, the parties stipulated to all material facts. Lexon and Defendants-Appellees each filed motions for summary judgment as to Lexon's claim for equitable subrogation.

In February 2024, a magistrate judge (Hon. Peter Bray, U.S.M.J.) issued a report recommending that Defendants-Appellees' motions be granted and that Lexon's motion be denied. ROA.2336-2360. As relevant here, the report concluded that (i) under OCSLA, the scope of Lexon's subrogation rights were governed by Louisiana law as surrogate federal law; and (ii) under Louisiana law, Lexon's subrogation rights did not extend to the government's claims against Defendants-Appellees.

In July 2024, the district court (Hon. Alfred H. Bennett, U.S.D.J.) issued an order adopting the report and recommendation, granting in relevant part the Defendants-Appellees' motion for summary judgment, denying Lexon's motion for summary judgment, and dismissing all of Lexon's claims against Defendants-Appellees. ROA.2397-2398.

The district court subsequently granted Lexon's unopposed motion to sever its claims against Defendants-Appellees from other claims that are still pending in the district court. ROA.2414-2418.

Lexon timely appealed the district court's judgment to this Court.
The panel's published decision affirmed the dismissal of Lexon's claim for
equitable subrogation. The panel held that (i) under OCSLA, established
federal common law is not extended to the Outer Continental Shelf; and
(ii) under Louisiana law as surrogate federal law, Lexon has no right to
be subrogated to the government's claims against Defendants-Appellees.
*See* Panel Op. at 7-10; *Lexon Ins. Co. v. Chevron U.S.A. Inc.*, 2025 WL
2397624, at *4-5 (5th Cir. Aug. 19, 2025).

## B.     Facts Necessary to the Argument of the Issues

Underlying this appeal is a dispute involving an oil-and-gas lease
covering a section of submerged land the Outer Continental Shelf off the
coast of Louisiana, as well as a related pipeline right-of-way. At various
times between 1983 and 2018, each of the Defendant-Appellees (or its
predecessor-in-interest) was a record title owner of the lease, the owner
of operating rights under the lease, the holder of a pipeline right-of-way,
or some combination thereof.

When an oil well, pipeline, or other facility is built on a lease or
right-of-way, the record title owner and owners of operating rights each
accrue decommissioning liability to the government. As the panel noted,

"[a]ll lessees and operators, past and present, are jointly and severally liable for these decommissioning obligations." Panel Op. at 2 n.1 (citing 30 C.F.R. §§ 250.1701, 556.604, 556.710).

The last record title owner of the lease was Linder. Under federal law, Linder was required to provide surety bonds to the government to secure the decommissioning obligations for the lease and right-of-way. Lexon, as surety for Linder, issued performance bonds with an aggregate penal sum of approximately $11.16 million in favor of the United States government, as security for the decommissioning obligations.

Linder went bankrupt before decommissioning the lease facilities. As a result, the government ordered the forfeiture of Lexon's performance bonds. Lexon paid the full penal sum of the bonds—some $11.16 million— to the United States, which used the money to pay most of the cost of decommissioning.

## REASONS FOR GRANTING THE PETITION

I.    **PRE-OCSLA ESTABLISHED FEDERAL COMMON LAW IS PART OF THE "LAWS . . . OF THE UNITED STATES" APPLICABLE ON THE OUTER CONTINENTAL SHELF.**

Section 4 of OCSLA extends "[t]he Constitution and laws . . . of the United States" to the Outer Continental Shelf "to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction

located within a State." 43 U.S.C. § 1333(a)(1)(A). At the same time, OCSLA provides that the laws of the adjacent state, "[t]o the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws . . . are declared to be the law of the United States for that portion of the . . . outer Continental Shelf." *Id.* § 1333(a)(2)(A).

Contrary to the panel's decision here, established federal common law is part of the body of federal law that OCSLA extends to the Outer Continental Shelf. Consider first the statute's plain text, which extends the "laws . . . of the United States" to the Outer Continental Shelf. "[T]o give 'laws' its natural meaning" is to construe it to include rules of substantive law adopted by federal courts, including "federal common law." *Illinois v. Milwaukee*, 406 U.S. 91, 100 (1972) (construing the term "laws . . . of the United States" in 28 U.S.C. § 1331 to encompass "claims founded upon federal common law as well as those of a statutory origin").

The context in which the term "laws . . . of the United States" is used in the statute makes clear that it encompasses federal common law. OCSLA extends federal law to the Outer Continental Shelf "to the same extent as if the outer Continental Shelf were an area of exclusive Federal

jurisdiction located within a State." 43 U.S.C. § 1333(a)(1)(A). There is no suggestion that federal common law would be inapplicable in any other federal enclave within a State. The statutory requirement that federal law be extended to the Outer Continental Shelf "to the same extent" can only be met if it includes preexisting, established federal common law. Otherwise, federal law will be extended to the Outer Continental Shelf only to a lesser extent.

Other textual clues also support this interpretation. If no federal law exists on a particular issue, the statute directs that "the civil and criminal laws of each adjacent State . . . are declared to be the law of the United States" for that portion of the Outer Continental Shelf. 43 U.S.C. § 1333(a)(2). There can be little doubt that when Congress used the phrase "the civil . . . laws of each adjacent State," it was incorporating not only state statutory law, but also judge-made, common-law rules. Indeed, much of the state law that is borrowed as surrogate federal law under OSCLA—including rules of contract law and tort law—is state common law.

It would be anomalous for Congress to use the word "laws" twice in the same sentence of § 1333(b)(2) but to give the word vastly different

meanings. Yet, under the panel's interpretation, the term "other Federal laws" is narrowly confined to federal statutes, whereas the phrase "civil . . . laws of each adjacent State" has a broader meaning that encompasses common law decisions. *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005) ("[I]dentical words used in different parts of the same statute are generally presumed to have the same meaning."); *accord Snow v. First American Title Ins. Co.*, 332 F.3d 356, 359 (5th Cir. 2003). OCSLA's design thus strongly suggests that Congress intended the term "laws" to include both statutes as well as common law.

Congress often uses "laws" to encompass both statutes and federal common law. For example, the statutory provision giving district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, has been held to vest district courts with subject-matter jurisdiction over lawsuits that arise under federal common law. *Illinois*, 406 U.S. at 100. In that context, the universe of "laws . . . of the United States" naturally includes the rules of federal common law, because those rules "are as fully 'laws' of the United States as if they had been enacted by Congress." *Id.* at 99. "Federal common law as articulated in rules that are fashioned by court

decisions are 'laws' as that term is used in § 1331." *National Farmers Union Ins. Cos. v. Crow Tribe*, 471 U.S. 845, 850 (1985).

The Supreme Court examined OCSLA's choice-of-law provisions in *Parker Drilling Management Services, Ltd. v. Newton*, 587 U.S. 601 (2019). There, the Court observed that "OCSLA extends *all* federal law to the [Outer Continental Shelf]," whereas "it borrows only certain state laws." *Id.* at 610 (emphasis added). In construing what it means for state law to be "inconsistent" with federal law in the context of § 1333(a)(2)(A), the Court considered and rejected a proposed interpretation of OCSLA in which "state law applies unless it conflicts with federal law," as in cases involving preemption. *Id.* Examining the text and history of the statute, the Court concluded that "the question is whether federal law has already addressed the relevant issue; if so, state law addressing the same issue would necessarily be inconsistent with existing federal law and cannot be adopted as surrogate federal law." *Id.* "[T]o the extent federal law applies to a particular issue, state law is inapplicable." *Id.* Thus, if federal courts have established a rule of federal common law as to a particular issue, then federal law has addressed that issue and, under *Parker Drilling*, such federal law should apply.

In *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473 (1981), the Supreme Court signaled that established federal common law is part of the body of federal law made applicable under Section 4 of OCSLA. The case involved a personal injury dispute arising on the Outer Continental Shelf. One of the questions before the Court was whether the jury should have been instructed that damages awards were not subject to federal income taxation. On the one hand, Supreme Court precedent established that, under federal common law, a defendant would be entitled to such an instruction. On the other hand, it was unclear whether such an instruction was mandatory under Louisiana law (which would, if no federal law spoke to the issue, be borrowed as surrogate federal law).

If federal common law were categorically not part of the laws of the United States under § 1333(a)(1)(A), then there would have been little question that Louisiana law governed the issue. But the Court began its analysis by noting that OSCLA "does not distinguish between federal statutory and judge-made law." *Gulf Offshore*, 453 U.S. at 487. The Court further noted that if there was a conflict between the two rules that made them inconsistent, "[i]t would seem then that" the federal common law precedent "controls." *Id.* However, the Court noted that the state law

question had not been addressed below, so it determined that the proper course was to remand for further proceedings as to whether there was a conflict and, if so, how that conflict should be resolved. *Id.* at 487-88.

The panel's decision here erroneously and narrowly construes the terms "laws . . . of the United States" under 43 U.S.C. § 1331(a)(1)(A) to include only federal statutes, despite the textual and contextual signs that Congress intended to encompass common law. What is more, the panel's decision conflicts with *Parker Drilling*'s instruction that "OCSLA extends all federal law to the [Outer Continental Shelf]" as well as *Gulf Offshore*'s observation that, if an established federal common law rule and a state rule on the same issue were in conflict, the former ought to prevail.

The panel nonetheless applied Louisiana state law instead of the federal common law of equitable subrogation, because "no federal statute governs the precise issue of a surety's right to seek subrogation from non-parties to bonds given to the United States." Panel Op. at 8. The panel quoted the Supreme Court's decision in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 104-05 (1971), for the proposition that "Congress made clear provisions for filling in the 'gaps' in federal law [with state law, however];

12

it did not intend that federal courts fill in those 'gaps' themselves by creating *new federal common law*.'" Panel Op. at 8 (emphasis added, modification in the original). But there is a distinction between applying long-established, preexisting federal common law and creating "new" federal common law.

Under the *Parker Drilling* framework, if federal law "addresses" an issue, then OSCLA requires its application. 587 U.S. at 610. Because the OSCLA does not distinguish between statutory law and common law, *see Gulf Offshore*, 453 U.S. at 487, the existence of federal common law on an issue means that federal law applies. When there is no existing federal common law on an issue, that triggers the statutory command to adopt state law as surrogate federal law, thus preventing the creation of new rules of federal common law.

A decision setting aside the entire body of established common law in favor of applying state law for cases arising on the Outer Continental Shelf has potentially wide-ranging implications. It is an issue worthy of consideration by a full en banc panel of this Court.

**II.    THE PANEL'S DECISION APPLYING INCONSISTENT STATE LAW IN PLACE OF ESTABLISHED FEDERAL COMMON-LAW PRINCIPLES OF EQUITABLE SUBROGATION WILL CAUSE DISRUPTION TO THE SURETY MARKET.**

Sureties play a vital role in many different types of transactions. For oil-and-gas leases on the Outer Continental Shelf, surety bonds provide financial assurance to regulators that lessees and operators will fulfill their decommissioning obligations, ensuring that taxpayers are not left to pay for removing abandoned wells, pipelines, and other lease facilities.

In exchange for the vital role played by sureties, the law has long provided a paying surety with rights to make itself whole. *See Am. Sur. Co. of New York v. Lewis State Bank*, 58 F.2d 559, 560 (5th Cir. 1932) ("A surety is indeed a favorite of equity, which will extend its aid in exoneration, quia timet, before he pays, and will subrogate him after he pays, liberally and fully, as against others primarily liable on the debt.").

One of a surety's most potent tools is its right of subrogation—the right to step into the shoes of the obligee and enforce the obligee's rights in order to secure reimbursement. *See* Restatement (Third) of the Law of Suretyship & Guaranty §§ 27, 28. More than 60 years ago, the Supreme Court observed in *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132 (1962),

that "probably there are few doctrines better established than that a surety who pays the debt of another is entitled to *all the rights* of the person he paid to enforce his right to be reimbursed." *Id.* at 136-37 (emphasis added).

The panel's decision in this case failed to apply well-settled federal common law and instead applied inconsistent state law in a way that significantly narrowed the scope of a surety's subrogation rights. As applied here, the panel concluded that, under Louisiana law, Lexon was not subrogated to the rights of the government against Defendants-Appellees, despite the fact that each of them was jointly and severally liable with Linder for the decommissioning obligations at issue.

Applying well-settled principles of federal common law of equitable subrogation in a consistent and uniform manner would preserve sureties' reliance interests and promote certainty and stability in the industry. By contrast, the panel's approach marks a significant departure from the existing federal common law of equitable subrogation. It will lead to uncertainty among sureties as to the scope of their equitable rights in connection with oil-and-gas leases on the Outer Continental Shelf. More uncertainty and more risk for sureties necessarily translates into higher

premiums for bond principals, and the inevitable consequence is diminished economic activity.

## CONCLUSION

This petition for rehearing en banc should be granted.

September 16, 2025

Adam J. Russ
GORDON, ARATA, MONTGOMERY,
 BARNETT, MCCOLLAM,
 DUPLANTIS & EAGAN LLC
1001 Fannin Street
Suite 3850
Houston, Texas 77002
(713) 333-5500
aruss@gamb.com

Armistead M. Long
GORDON, ARATA, MONTGOMERY,
 BARNETT, MCCOLLAM,
 DUPLANTIS & EAGAN LLC
1015 St. John Street
Lafayette, Louisiana 70501
(337) 237-0132
along@gamb.com

Respectfully submitted,

Kyle D. Gooch
HARRIS BEACH MURTHA
 CULLINA PLLC
99 Garnsey Road
Pittsford, New York 14534
(585) 419-8800
kgooch@harrisbeachmurtha.com

*/s/ Brian D. Ginsberg*

Brian D. Ginsberg
 *Counsel of Record*
HARRIS BEACH MURTHA
 CULLINA PLLC
445 Hamilton Avenue
Suite 1206
White Plains, New York 10601
(914) 683-1200
bginsberg@harrisbeachmurtha.com

# CERTIFICATE OF SERVICE

I, Brian D. Ginsberg, a member of the Bar of this Court and counsel of record for plaintiff-appellant Lexon Insurance Company, Inc., certify that, on September 16, 2025, a copy of the foregoing Petition for Rehearing En Banc was filed with the Clerk of the Court through the Court's electronic filing system. I further certify that all parties required to be served have been served.

September 16, 2025                    Respectfully submitted,

*/s/ Brian D. Ginsberg*
Brian D. Ginsberg
 *Counsel of Record*
HARRIS BEACH MURTHA
 CULLINA PLLC
445 Hamilton Avenue
Suite 1206
White Plains, New York 10601
(914) 683-1200
bginsberg@harrisbeach.com

*Counsel for Plaintiff-Appellant*
*Lexon Insurance Company, Inc.*

## CERTIFICATE OF COMPLIANCE

I, Brian D. Ginsberg, a member of the Bar of this Court and counsel of record for plaintiff-appellant Lexon Insurance Company, Inc., certify, pursuant to Federal Rule of Appellate Procedure 40(d)(3)(A) that the attached Petition for Rehearing En Banc is proportionately spaced, has a typeface of 14 points or more, and contains 3,024 words, not counting the words excepted by Federal Rule of Appellate Procedure 32(f).

September 16, 2025                    Respectfully submitted,

                                     */s/ Brian D. Ginsberg*
                                     Brian D. Ginsberg
                                      *Counsel of Record*
                                     HARRIS BEACH MURTHA
                                      CULLINA PLLC
                                     445 Hamilton Avenue
                                     Suite 1206
                                     White Plains, New York 10601
                                     (914) 683-1200
                                     bginsberg@harrisbeach.com

                                     *Counsel for Plaintiff-Appellant*
                                     *Lexon Insurance Company, Inc.*

# United States Court of Appeals
# for the Fifth Circuit

————————————

No. 24-20347

————————————

United States Court of Appeals
Fifth Circuit

**FILED**

August 19, 2025

Lyle W. Cayce
Clerk

Lexon Insurance Company, Incorporated,

*Plaintiff—Appellant,*

*versus*

Chevron U.S.A. Incorporated; Sojitz Energy Venture, Incorporated; BP America Production Company,

*Defendants—Appellees.*

————————————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:21-CV-990

————————————————————————

Before Southwick, Oldham, and Ramirez, *Circuit Judges.*
Irma Carrillo Ramirez, *Circuit Judge*:

After the holder and operator of an offshore oil and gas lease defaulted on its well decommissioning obligations, its surety was required to pay the federal government over $11 million. The surety, Lexon Insurance Company, Inc., sued the prior leaseholders for reimbursement, but the district court dismissed its claims. We AFFIRM the dismissal.

No. 24-20347

## I

In 1983, a predecessor of BP America Production Company obtained from the United States an oil and gas lease for West Cameron Block 168, a portion of the Outer Continental Shelf (OCS) located off the Louisiana coast. Chevron U.S.A. Inc. ultimately acquired the lease, and it was granted a right-of-way (ROW) for construction of a pipeline in connection with the lease. Chevron assigned record title to the lease and ROW to Linder Oil Company under the terms of a subsequent Purchase and Sale Agreement in 2005, but it retained the deep operating rights. Linder Oil in turn agreed to assume all decommissioning obligations[1] under the lease and to indemnify Chevron for any related liability.

Linder Oil immediately assigned its interest in the lease to Reserves Management, L.C. and Destin Resources, LLC, which designated Linder Oil as the operator of the shallow rights under the lease (excluding Chevron's deep operating rights), but it held the ROW. Reserves and Destin each conveyed half of their respective interests in the lease to Sojitz Energy Venture, Inc., which also designated Linder Oil as the operator for the shallow rights; in 2015, Sojitz transferred its interests in the lease back to Reserves and Destin. Linder Oil agreed to release Sojitz from all

---

[1] Applicable federal regulations mandate that all offshore wells, platforms, pipelines, and other facilities on the OCS must be decommissioned after the lease ends. *See* 30 C.F.R. §§ 250.1702–1703. All lessees and operators, past and present, are jointly and severally liable for these decommissioning obligations. *See id.* at §§ 250.1701; 556.604; *see also id.* at § 556.710 ("Even after assignment, BOEM . . . may require [an assignor] to bring the lease into compliance if your assignee or any subsequent assignee fails to perform any obligation under the lease, to the extent the obligation accrued before approval of your assignment.").

decommissioning obligations arising under the lease and to indemnify it for any related claims.[2]

The Bureau of Ocean Energy Management (BOEM) subsequently required Linder Oil to provide performance bonds to secure the decommissioning obligations under the lease. Its surety, Lexon, issued eight performance bonds with an aggregate penal sum of $11,163,300 in favor of the United States in March 2016, to secure Linder Oil's decommissioning obligations. Lexon required Linder Oil to post collateral as security for its bond obligations, and Linder Oil obtained two letters of credit totaling $9,985,500, with Lexon as beneficiary, from a Louisiana bank. After the bank was closed by Louisiana regulators, the FDIC took over, and it notified Lexon that it was repudiating the letters of credit.

Linder Oil, Reserves, and Destin filed a Chapter 7 bankruptcy proceeding in 2017. Destin and Reserves held record title interest in the lease and Linder Oil held the ROW when both ended in 2018. BOEM notified the bankruptcy trustee that Linder Oil had failed to complete its decommissioning obligations under the lease and ROW and ordered forfeiture of the bonds. Lexon paid the aggregate penal sum of the bonds to BOEM, which transferred the funds to Sojitz and Chevron, and they completed the decommissioning work at a cost exceeding the sum of the bonds.

Lexon sued Chevron, Sojitz, and BP America (Defendants) for reimbursement of the full amount of the bonds under theories of subrogation,

---

[2] The parties agreed that Sojitz would be responsible for no more than $2,700,000 for decommissioning obligations, and that payment was contingent on Linder Oil providing an Authority for Expenditure (AFE) approved by Sojitz. It is undisputed that Linder Oil never submitted an AFE prior to its bankruptcy.

No. 24-20347

contribution, and unjust enrichment.[3] The parties both moved for summary judgment based on a joint stipulation of facts. A magistrate judge recommended entry of summary judgment for Defendants, finding that Lexon was not entitled to reimbursement based on subrogation because (1) Louisiana does not recognize equitable subrogation; (2) Lexon, as surety of the principal obligor, has no right to legal subrogation under Louisiana law; and (3) 31 U.S.C. § 9309 does not provide subrogation rights against anyone other than a surety's principal. He also found that Lexon was not entitled to contribution from Defendants because it does not have a right of contribution from sub-sureties who are indemnified by the surety's principal, and that Lexon could not recover based on unjust enrichment because any enrichment to Defendants for decommissioning obligations was contractually justified. Over Lexon's objections, the district judge adopted the magistrate judge's recommendation in its entirety and dismissed Lexon's claims against Defendants.[4]

On appeal, Lexon argues that (1) it is entitled to reimbursement from Defendants based on subrogation under federal law; (2) even if Louisiana law applies, it is entitled to relief under the state's "legal subrogation" remedy; and (3) it is entitled to recover on its alternative claims for contribution and unjust enrichment under Louisiana law.

## II

We review grants of summary judgment de novo, applying the same legal standards as the district court. *See Colony Ins. Co. v. First Mercury Ins.*

---

[3] Lexon also sued two individuals affiliated with Linder Oil who had executed an indemnity agreement in favor of Lexon, but its claims against them are not at issue here.

[4] Lexon also asserted a claim for equitable subordination, but by not challenging its dismissal, Lexon has forfeited the claim. *See Rollins v. Home Depot USA*, 8 F.4th 393, 398 (5th Cir. 2021).

*Co.*, 88 F.4th 1100, 1106 (5th Cir. 2023). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "On cross-motions for summary judgment, we review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Discover Prop. & Cas. Ins. Co. v. Blue Bell Creameries USA, Inc.*, 73 F.4th 322, 327 (5th Cir. 2023) (citation omitted).

## III

The Outer Continental Shelf Lands Act (OCSLA) extends the laws and jurisdiction of the United States to the subsoil and seabed of the OCS, including any artificial structures permanently or temporarily attached thereon. 43 U.S.C. § 1333(a)(1). "All law on the OCS is federal, and state law serves a supporting role, to be adopted only where there is a gap in federal law's coverage." *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 616 (2019). When there is a gap to fill in federal law, the law of the adjacent state applies as surrogate federal law to the extent that it is not inconsistent with federal laws and regulations. *Id.* § 1333(a)(2)(A); *see also Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 358–60 (1969). But if a federal law has addressed a particular issue, a state law addressing the same issue cannot be adopted as surrogate federal law because it would "necessarily be inconsistent with existing federal law." *Parker Drilling*, 587 U.S. at 610.

All parties agree that OCSLA governs this dispute and that Louisiana law applies to fill any federal-law gaps. Lexon contends that federal law, either through 31 U.S.C. § 9309 or federal common law of equitable subrogation, addresses all relevant aspects of its subrogation claim.

## A

Section 9309, titled "Priority of sureties," states in full:

No. 24-20347

> When a person required to provide a surety bond given to the United States Government is insolvent or dies having assets insufficient to pay debts, the surety, or the executor, administrator, or assignee of the surety paying the Government the amount due under the bond--(1) has the same priority to amounts from the assets and estate of the person as are secured for the Government; and (2) personally may bring a civil action under the bond to recover amounts paid under the bond.

31 U.S.C. § 9309. Lexon argues that § 9309 addresses its subrogation claim because the statute "enables a surety who is compelled to pay the government under a bond securing its principal's governmental obligations to obtain reimbursement from any party whom the government lawfully could have forced to satisfy those obligations." Its reliance on this statute is misplaced.

Section 9309, by its plain text and title, establishes the priority and recovery rights of a surety that has paid the United States the amount due under a bond. *See In re Tri-Union Dev. Corp.*, 479 B.R. 425, 443 (Bankr. S.D. Tex. 2012) ("The statute codifies the priority of sureties when a principal obligor is insolvent or dies having assets insufficient to pay debts."); *cf. Almendarez–Torres v. United States*, 523 U.S. 224, 234 (1998) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." (internal quotation marks omitted)). When read in its entirety, § 9309 confers on a surety that pays its principal's debt to the United States the same priority as the United States to the insolvent principal's assets and estate; it authorizes the surety to bring a civil action personally "under the bond" for the recovery of the amount paid. *See In re J. Menist Co.*, 289 F. 229, 231 (2d Cir. 1923) (explaining that the

predecessor statute to § 9309[5] "merely gives to the surety the right to bring suit in its own name for the recovery of all moneys which the surety has paid, and it gives him in addition the same priority in the assertion of that right which is given to the United States").

Contrary to Lexon's suggestion, § 9309 does not broadly authorize a surety to file suit against *any* party for the recovery of amounts paid to the government. Instead, the surety is limited to bringing "a civil action *under the bond.*" 31 U.S.C. § 9309 (emphasis added). Generally, "[a] surety bond creates a three-party relationship, in which the surety becomes liable for the principal's debt or duty to the third party obligee." *Matter of Falcon V, L.L.C.*, 44 F.4th 348, 351 (5th Cir. 2022) (quoting *Ins. Co. of the W. v. United States*, 243 F.3d 1367, 1370 (Fed. Cir. 2001)). Because Defendants are not parties to the bonds, Lexon cannot seek subrogation against them under § 9309.

## B

Lexon next argues that the laws of the United States that the OCSLA extends to the OCS encompass "established federal common" like equitable

---

[5] The predecessor statute, § 3468 of the Revised Statutes, is substantially similar to the current version:

Whenever the principal in any bond given to the United States is insolvent, or whenever, such principal being deceased, his estate and effects which come to the hands of his executor, administrator, or assignee, are insufficient for the payment of his debts, and, in either of such cases, any surety on the bond, or the executor, administrator, or assignee of such surety pays to the United States the money due upon such bond, such surety, his executor, administrator, or assignee, shall have the like priority for the recovery and receipt of the moneys out of the estate and effects of such insolvent or deceased principal as is secured to the United States, and may bring and maintain a suit upon the bond, in law or equity, in his own name, for the recovery of all moneys paid thereon.

subrogation. It is true that "there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed." *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136 (1962). "Congress made clear provision for filling in the 'gaps' in federal law [with state law, however]; it did not intend that federal courts fill in those 'gaps' themselves by creating new federal common law." *Chevron Oil Co. v. Huson*, 404 U.S. 97, 104–05 (1971). "This policy of federal deference reflects the Congress's recognition of the special relationship which exists between the [OCS] and the adjacent states." *Matte v. Zapata Offshore Co.*, 784 F.2d 628, 631 (5th Cir. 1986). Indeed, both the Supreme Court and this circuit have consistently recognized that state law, not "federal common law," applies as surrogate federal law under the OCSLA. *See id.* at 104 & n.8 ("[F]ederal courts should not create interstitial federal common law when the Congress has directed that a whole body of state law shall apply."); *Fontenot v. Dual Drilling Co.*, 179 F.3d 969, 977 (5th Cir. 1999) ("[O]ur Circuit has consistently rejected attempts of litigants to have 'federal common law' override rules of Louisiana tort law in actions arising on fixed platforms on the [OCS]." (citing cases)).

Because no federal statute governs the precise issue of a surety's right to seek subrogation from non-parties to bonds given to the United States that secure the performance of obligations on the OCS, a gap in federal law exists. The OCSLA mandates that this gap be filled by the laws of the adjacent state, "to the extent they are applicable and not inconsistent with" federal law. 43 U.S.C. § 1333(a)(2)(A). Lexon does not assert that Louisiana law is inconsistent with federal law. The district court was therefore correct to turn to Louisiana law to analyze the substance of Lexon's subrogation claim.

IV

Lexon asserts that the district court erred in concluding that it is not entitled to recover from Defendants under Louisiana's "legal subrogation" remedy. We disagree.

Under Louisiana law, a "surety who pays the principal obligation is subrogated by operation of law to the rights of the creditor." LA. CIV. CODE art. 3048. Article 1829 of the Louisiana Civil Code, in turn, specifies the limited circumstances where subrogation occurs by operation of law. *See Wilhite v. Schendle*, 92 F.3d 372, 377 (5th Cir. 1996) ("The five instances in which 'legal' subrogation may occur are specifically listed in LA. CIV. CODE art. 1829."). As relevant here, "[s]ubrogation takes place by operation of law . . . [i]n favor of an obligor who pays a debt he owes with others or for others and who has recourse against the others as a result of the payment." LA. CIV. CODE art. 1829(3).

"Article 1829(3) is an exception to the general rule that subrogation does not take place when a third person pays the debt of another." *Martin v. La. Farm Bureau Cas. Ins. Co.*, 638 So.2d 1067, 1068 (La. 1994); *accord A. Copeland Enters., Inc. v. Slidell Mem'l Hosp.*, 657 So. 2d 1292, 1297 (La. 1995); *see also* LA. CIV. CODE art. 1855 (stating general rule that "[p]erformance rendered by a third person effects subrogation only when so provided by law or agreement"). For legal subrogation to exist under the provision, "the obligor must have a recourse against the other obligors with whom or for whom he is bound." Saul Litvinoff, *Subrogation*, 50 LA. L. REV. 1143, 1170 (1990). "Due to the exceptional nature of subrogation by operation of law, the right is strictly construed." *Martin*, 638 So.2d at 1068.

Here, the district court determined that Lexon was not entitled to legal subrogation under Article 1829(3) because it had failed to show it has any right of recourse against them "as a result of" its payment under the

bonds. Lexon does not challenge the court's conclusion that it lacks recourse against Defendants based on its payment. It instead argues that the district court misconstrued the scope of its legal subrogation rights under the Civil Code. This argument lacks merit.

Lexon asserts that Article 1829(3) does not specifically limit the scope of rights to which a paying surety is subrogated under Article 3048, but the Louisiana Supreme Court has made clear that "the effects of legal subrogation are circumscribed and carefully spelled out in the Civil Code." *State Farm Mut. Auto. Ins. Co. v. Berthelot*, 732 So. 2d 1230, 1233 (La. 1999). Further, Civil Code articles on the same subject matter must be interpreted in reference to each other. LA. CIV. CODE art. 13 ("Laws on the same subject matter must be interpreted in reference to each other."); *see also St. James Bank & Tr. Co. v. S & H Enters., Inc.*, 532 So. 2d 915, 916 (La. Ct. App. 1988) (reading Article 3048 in conjunction with a different subrogation provision because they deal with the same subject matter). The district court correctly applied Louisiana law when it concluded that Lexon was not entitled to legal subrogation.

V

Lexon asserts an alternative claim for contribution under Article 3055. It states:

> Co-sureties are those who are sureties for the same obligation of the same obligor. They are presumed to share the burden of the principal obligation in proportion to their number unless the parties agreed otherwise or contemplated that he who bound himself first would bear the entire burden of the obligation regardless of others who thereafter bind themselves independently of and in reliance upon the obligation of the former.

La. Civ. Code art. 3055. "The presumption that each surety owes his or her virile share may be rebutted upon the showing of either of two circumstances: (i) the parties agreed otherwise or (ii) there was an understanding that the first surety to bind himself would bear the entire burden." *Scarborough v. Scarborough*, 25 So. 3d 941, 944 (La. Ct. App. 2009).

Lexon argues it is entitled to judgment as a matter of law on Defendants' liability for their proportional share of amounts it paid under the bonds. But the very premise of the claim—a shared, equal burden—is absent here. Lexon does not point to any evidence showing it was a "co-surety" with any defendant. Even if Defendants were co-sureties under Article 3055, Linder Oil's agreement to assume the decommissioning obligations and to indemnify Defendants for claims based on the obligations rebuts any presumption that they agreed to "share the burden of the principal obligation."

## VI

Lexon generally argues that the record evidence establishes all the elements for unjust enrichment.

In Louisiana, "[a] person who has been enriched without cause at the expense of another person is bound to compensate that person." La. Civ. Code art. 2298. To establish a claim for unjust enrichment, a plaintiff must show "(1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) an absence of justification or cause for the enrichment and impoverishment; and (5) no other available remedy at law." *Zeising v. Shelton*, 648 F. App'x 434, 437 (5th Cir. 2016) (quoting *Pinegrove Elec. Supply Co. v. Cat Key Const., Inc.*, 88 So.3d 1097, 1100 (La. Ct. App. 2012)). "If there is a contract between the parties it serves as a legal cause, an explanation, for the enrichment. Only the unjust enrichment for which there is no justification in law or contract allows equity a role in the

adjudication." *Edwards v. Conforto*, 636 So.2d 901, 907 (La. 1993), *on reh'g* (May 23, 1994) (citation modified).

Here, the undisputed summary judgment evidence shows that Lexon's payment is based on bonds it issued to secure Linder Oil's decommissioning obligations, and any enrichment enjoyed by Defendants in avoiding those costs resulted from their bargained-for indemnity agreements with Linder Oil. Given these business transactions, there is a sufficient "justification in law" for any enrichment of Defendants by Lexon paying for decommissioning obligations arising out of the lease. *See Edwards*, 636 So. 2d at 907 ("The justification or cause for the lessor's enrichment was the contractual agreement between the parties.").

\* \* \*

The judgment of the district court is AFFIRMED.